# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PEDRO RAMOS, JR.**
                **Plaintiff,**

      **v.**                                                     **Case No. 09-C-0392**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff Pedro Ramos applied for social security disability benefits, claiming that he could no longer work due to heart problems, fibromyalgia, obesity and depression. The Social Security Administration ("SSA") denied the application initially (Tr. at 60; 76; 620) and on reconsideration (Tr. at 61; 81; 621), as did an Administrative Law Judge ("ALJ") after a hearing in a decision dated September 14, 2006 (Tr. at 62-72). The SSA's Appeals Council vacated and remanded for reconsideration of plaintiff's obesity (Tr. at 74-75), but on June 20, 2008, the ALJ issued another unfavorable decision, in large part re-adopting his previous conclusions (Tr. at 18-27). This time the Council denied review (Tr. at 7), making the ALJ's decision the agency's final word on the application. See Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009).

Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g). Because the ALJ's decisions are unreasoned, internally inconsistent, and based on a misunderstanding of plaintiff's impairments and an incomplete reading of the record, I must remand for further proceedings. I will also recommend that the Commissioner assign the case to a different ALJ.

# I.  APPLICABLE LEGAL STANDARDS

## A.     Judicial Review

Under § 405(g), the reviewing court determines whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error.  Nelms, 553 F.3d at 1097.  Evidence is "substantial" if it is sufficient for a reasonable mind to accept as adequate to support the decision.  Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008).  Accordingly, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld.  See, e.g., Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  The court does not re-weigh the evidence, resolve evidentiary conflicts, decide questions of credibility, or substitute its judgment for the ALJ's.  Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

Nevertheless, the court must review the entire record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision.  Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005).  Further, the court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result, see, e.g., Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996), lacks a meaningful discussion of important evidence, see, e.g., Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007), or rests upon flawed logic or serious errors in reasoning, see, e.g., Indoranto v. Barnhart, 374 F.3d 470, 475 (7th Cir. 2004) (citing Carradine v. Barnhart, 360 F.3d 751, 754-56 (7th Cir. 2004)).  Similarly, if the ALJ commits an error of law, reversal is "required without regard to the volume of evidence in support of the factual findings."  Binion v. Chater, 108 F.3d

2

780, 782 (7th Cir. 1997). The ALJ commits legal error if he fails to comply with the SSA's regulations and Rulings for evaluating disability claims. See, e.g., Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004).

**B.      Disability Standard**

The SSA has adopted a sequential, five-step test for determining disability, pursuant to which the ALJ asks:

(1)      Has the claimant engaged in substantial gainful activity ("SGA") since his alleged onset of disability?

(2)      If not, does he suffer from a severe, medically determinable impairment?

(3)      If so, does that impairment meet or equal any impairment listed in SSA regulations as presumptively disabling?

(4)      If not, does he retain the residual functional capacity ("RFC") to perform his past work?

(5)      If not, can he perform other jobs existing in significant numbers?

See, e.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. See, e.g., Briscoe, 425 F.3d at 352. The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines, a chart that classifies a person as disabled or not disabled based on his age, education, work experience, and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994).

3

## II.  FACTS AND BACKGROUND

**A.     Medical Evidence**

**1.     Heart Problems**

Plaintiff suffered a heart attack in February 2002 and underwent bypass surgery the following month.  He initially did well after the surgery, but in July 2002 developed symptoms of exertional angina and subsequently underwent angioplasty and stenting in August of 2002.  He again did well for a time but then developed atypical chest pain and, following an abnormal stress test, underwent cardiac catheterization in July 2003.  Thereafter, his complaints of dyspnea on exertion and fatigue returned, and his doctors performed a stress test in April 2004, which was again abnormal, so in May of 2004 he underwent repeat cardiac catheterization.  (Tr. at 192-201; 213-14; 216-22; 240-46; 275-76; 281; 317; 610-11.)

Plaintiff's cardiac problems continued in 2005.  On March 11, 2005, he visited the Aurora Clinic in Elkhorn, which transferred him to St. Luke's Hospital based on his complaints of chest burning and tightness.  On March 13, he underwent an adenosine myocardial perfusion scan at St. Luke's, which revealed mild ischemia in the mid anterior wall of the left ventricle.  (Tr. at 514-16; 519-20; 598-608.)  On October 12, plaintiff saw Dr. Imran Niazi at the Arrhythmia Center for an echocardiogram, which revealed mild left ventricular hypertrophy, and mild mitral and tricuspid regurgitation.  (Tr. at 512.)

On April 12, 2006, plaintiff returned to the Arrhythmia Center for a stress echocardiogram, which was normal.  (Tr. at 513.)  However, on June 25, 2007, plaintiff presented at Lakeland Medical Center with chest pain and was transferred to St. Luke's Hospital, where he underwent repeat cardiac catheterization on June 26, 2007.  The procedure

4

revealed severe and diffuse right coronary artery disease.  (Tr. at 677-91.)

Plaintiff's primary treating cardiologist, Dr. Charles Lanzoratti, prepared a cardiac RFC questionnaire indicating that plaintiff suffered from "class III" coronary artery disease, with a fair prognosis.  He listed plaintiff's symptoms as chest pain, shortness of breath and fatigue.  He indicated that plaintiff complained of shortness of breath with ordinary activities on a daily basis, and that plaintiff had marked limitation of physical activity as demonstrated by fatigue, palpitation, dyspnea or anginal discomfort. (Tr. at 173.)  He indicated that plaintiff was capable of only low stress jobs, and that his cardiac symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. at 174.)  Dr. Lanzoratti opined that plaintiff could stand/walk about two hours and sit six hours in an eight hour workday.  He further opined that plaintiff required a job that permitted shifting positions at will, as well as unscheduled breaks of about fifteen minutes every two hours.  He also required a job that allowed him to elevate his legs with prolonged sitting, about 40% of the day in a sedentary job.  (Tr. at 175.)  He could occasionally lift ten pounds, rarely lift twenty, but never more; twist and stoop occasionally, but never crouch or climb ladders or stairs; and should avoid all exposure to extreme cold or heat.  (Tr. at 175-76.)  Plaintiff would, according to Dr. Lanzarotti, miss about two days per month based on his impairments.  (Tr. at 176.)

### 2.    Musculoskeletal and Mental Problems

Following the onset of his heart problems, plaintiff also complained of muscle pain, stiffness and fatigue.  Plaintiff's doctors at times expressed puzzlement at the cause of his problems but eventually settled on a diagnosis of fibromyalgia.

Plaintiff saw Dr. Janis Lowell in 2003, complaining of aches and pains in all the joints of his body.  The doctor diagnosed polymyalgia arthralgia of uncertain etiology and ordered an

5

arthritis panel.  (Tr. at 339.)  During a follow-up visit, plaintiff continued to complain of severe polymyaglias, but Dr. Lowell noted an unremarkable exam and negative arthritis work-up.  (Tr. at 337.)

In August of 2003 plaintiff underwent right elbow surgery with Dr. Fideler, who later released him to work with a twenty pound lifting restriction.  However, plaintiff asked Dr. Lowell to make it five pounds; she agreed for two weeks, with increased limits thereafter.  (Tr. at 336.)  On December 15, 2003, Dr. Lowell noted that plaintiff complained of the "usual" aches and pains, causing her to suspect a psychosomatic component.  (Tr. at 333.)

On April 27, 2005, plaintiff underwent repeat right elbow surgery.  (Tr. at 509.)  In her pre-surgery clearance exam notes, plaintiff's primary care physician, Dr. Deanna Courier, noted that the 2003 surgery provided little relief.  Plaintiff also complained of non-specific aches and pains, mostly in his ankles and knees.  (Tr. at 509-10.)  Between April and September 2005, and again in October and November 2005, plaintiff underwent physical therapy for his right elbow, but attended irregularly and did not make progress towards his goals.  (Tr. at 572-89; 553-566)

Plaintiff returned to Dr. Courier on February 9, 2006, complaining of worsening pain and fatigue.  After detailing the various medications plaintiff had tried without relief, Dr. Courier indicated that she was not sure what else to do.  Plaintiff had seen a rheumatologist, with no results.  Dr. Courier tried a new anti-inflammatory, as well as Cymbalta.  (Tr. at 493; 673.)

Plaintiff next saw Dr. Courier on March 14, 2006, complaining of bilateral myalgias and paresthesias, as well as neck pain. (Tr. at 507-08.)  That same day, plaintiff consulted with Dr. Arshad Ahmed, a neurologist, regarding bilateral myalgias and paresthesias, which he reported developing following his bypass surgery in 2002.  He also complained of constant neck pain

6

and discomfort. Plaintiff indicated that he was placed on Lipitor after the bypass, and that after one week he developed severe pain. He was eventually switched to Lovastatin, which did not seem to have the same kind of side effects, but his myalgias continued. He discontinued the medication for a few weeks, but his symptoms did not improve. Dr. Ahmed ordered tests, including an MRI of the cervical spine and an EMG and nerve conduction study. If nothing showed on the tests, Dr. Ahmed planned to discontinue Lovastatin for several months to see if that improved plaintiff's condition. (Tr. at 540-41.)

On March 23, 2006, plaintiff underwent the EMG and nerve conduction studies, which were normal. (Tr. at 535.) However, an MRI completed on March 28 revealed broad-based disc bulging at C6-7 and mild disc bulging at C3-4. (Tr. at 613-14.) Plaintiff returned to Dr. Ahmed on March 30, reporting that his symptoms had not improved with the discontinuation of Novastatin. Dr. Ahmed ordered a brain MRI to rule out demyelinative disease and started plaintiff on Neurontin. (Tr. at 530.) A May 5 MRI of the brain was negative. (Tr. at 528.)

On May 15, 2006, plaintiff returned to Dr. Ahmed complaining of myalgic pain, worse with activity and physical exertion, unimproved following the discontinuation of Lovastatin. Dr. Ahmed continued him off this medication for another two to three months. (Tr. at 524.)

On January 3, 2007, plaintiff saw Dr. Andrew Jasek, a rheumatologist, who diagnosed fibromyalgia after finding 18 of 18 tender points indicative of that disease. Dr. Jasek prescribed sleep and pain medications, and recommended aerobic exercise. (Tr. at 668-70.)

Two of plaintiff's treating physicians completed reports regarding his musculoskeletal problems and accompanying depression. Dr. Courier listed plaintiff's diagnoses as fibromyalgia and depression, and his symptoms as multi-joint pain, muscle pain, malaise and weakness. (Tr. at 122; 654.) She opined that his pain was severe enough to interfere with

7

attention and concentration frequently, and that he had a marked limitation in his ability to deal with work stress.  (Tr. at 122-24.)  Regarding his functional abilities, she stated that he could walk one block without rest, continuously sit and stand more than two hours, and sit and stand a total of about four hours in an eight hour work day.  He required a job that allowed him to shift positions at will from sitting to standing and would need to take unscheduled, five to ten minute breaks every one to two hours.  With prolonged sitting, he had to elevate his legs about two feet.  He could occasionally lift ten pounds, never more, and could not bend or twist.  Finally, Dr. Courier noted that plaintiff had definite psychological limitations regarding his depression and chronic pain.  (Tr. at 122-26.)

In his report, Dr. Scott Dresden listed plaintiff's diagnoses as fibromyalgia, depression and poly-athralgia.  (Tr. at 482; 665.)  He indicated that plaintiff's symptoms would frequently interfere with attention and concentration, producing a marked limitation in plaintiff's ability to deal with work stress.  (Tr. at 483-84.)  He opined that plaintiff could walk one to two blocks, and continuously sit and stand about thirty minutes.  During the course of an eight hour workday, plaintiff could sit and stand/walk less than two hours (each).  Plaintiff also required a job that permitted him to shift positions at will.  (Tr. at 484.)  He could frequently lift less than ten pounds, occasionally twenty, but never more (Tr. at 485), and would miss more than three days per month based on his impairments (Tr. at 486).

### 3.    SSA Consultants

The record also contains reports prepared by SSA consultants.  On March 18, 2004, Dr. Dar Muceno completed a physical RFC assessment based on a medical record review, finding plaintiff capable of light work with no other limitations.  (Tr. at 177-84.)  Dr. Robert Callear reviewed and affirmed this assessment on November 1, 2004.  (Tr. at 184.)

8

On August 26, 2004, plaintiff underwent a psychological evaluation with Marcy Halvorson, Ph.D. Dr. Halvorson assessed major depressive disorder, single episode, severe, with a current GAF ("Global Assessment of Functioning") of 50, highest in past year, 70. Dr. Halvorson indicated that plaintiff could understand, remember and carry out simple instructions; respond appropriately to supervisors and co-workers; and maintain attention and concentration, although his work pace might be slowed by his physical health restraints. She indicated that his physical health problems constituted the main reason for his disability application and should be evaluated by a physician. (Tr. at 454-57.)

On October 28, 2004, Keith Bauer, Ph.D., completed a psychiatric review technique form, evaluating plaintiff under Listing 12.04, Affective Disorders, and finding no restriction of activities of daily living or social functioning, and moderate difficulty in maintaining concentration, persistence and pace. (Tr. at 468-81.) In an accompanying mental RFC report, Dr. Bauer found no significant limitation in sixteen categories, moderate limitation in four. (Tr. at 464-65.)

## B. Hearing Testimony

### 1. 2006 Hearing

At the initial hearing before the ALJ, held on June 20, 2006, plaintiff testified that he was forty-three years old (d.o.b. 5/18/63), 5'7" tall, 243 pounds, with a tenth grade education. (Tr. at 705.) He described past work as a loader and chemical sprayer, laborer, material handler and injection molder, landscaper, and assembler and solderer, all performed at the medium to heavy level. (Tr. at 705-07.) He indicated that at the time of the hearing he worked odd jobs, such as planting flowers and mowing lawns. He stated that he lived with his girlfriend,

9

and she paid for everything.  (Tr. at 707-08.)

Plaintiff testified that his ability to work was limited by fatigue, joint pain and trouble breathing in hot weather.  (Tr. at 708.)  He stated that he attempted to do chores around the house like washing dishes or vacuuming, but his legs got tired after about forty-five minutes, and he had to sit down to rest.  (Tr. at 709.)  He stated that he had to sit down and put his legs up two to three times per day.  He indicated that he could walk or sit for about fifteen minutes to ½ hour and lift about twenty pounds, but not repetitively.  (Tr. at 709-11; 716.)  Repetitively, he could lift only five to ten pounds.  (Tr. at 716.)  He also stated that he experienced shortness of breath with walking or lifting.  (Tr. at 713.)  Plaintiff testified that he took various medications, including blood thinners and muscle relaxers (Tr. at 711), some of which made him feel "loopy" or "goofy" for about thirty minutes, during which time he could not concentrate (Tr. at 713).

Plaintiff's step-father, Marco Martinez, testified that plaintiff used to work for his construction business and was a very hard worker before his heart attack.  (Tr. at 719-20.)  He testified that he currently used plaintiff for small things, such as mowing grass, but after about an hour plaintiff would become too fatigued and stiff to continue.  (Tr. at 721-23.)

The ALJ summoned a medical expert, Kenneth Sherry, Ph.D., to the 2006 hearing to assess plaintiff's psychological functioning.  (Tr. at 725.)  Like Dr. Bauer, Dr. Sherry evaluated plaintiff under Listing 12.04, Affective Disorders, assessing mild restriction of daily activities, mild restriction of social functioning, mild to moderate difficulty in maintaining concentration, persistence and pace, and no episodes of decompensation.  (Tr. at 727.)

The VE at the 2006 hearing, Leslie Goldsmith, classified plaintiff's past employment as medium to heavy, unskilled work, which produced no skills transferrable to other jobs.  (Tr. at 730.)  The ALJ then asked a series of hypothetical questions, assuming a person of plaintiff's

10

age, education and work experience. (Tr. at 730.) Assuming the restrictions contained in Dr. Dresden's report, the VE opined that the person could not return to plaintiff's past work or perform any other job in the economy. (Tr. at 731.) Assuming the restrictions in the physical RFC report prepared by the SSA consultants, plaintiff's past work could not be done but other jobs could, including mail clerk, general office clerk, security guard, sales clerk and cashier. (Tr. at 732.) Assuming that the person could lift twenty pounds occasionally, ten pounds frequently, and needed a sit/stand option after about thirty minutes, past work again could not be done, but other jobs could, including general office clerk (but ½ the number previously given), security guard (again in reduced numbers) and food preparation. (Tr. at 733.) Adding the requirement that the person needed to elevate his legs three times per day for fifteen minutes (i.e, two times beyond scheduled breaks), all of the jobs would be eliminated. (Tr. at 734.) Anything longer than five minutes would be a problem, the VE said. (Tr. at 735.)

### 2.    2008 Hearing

At the hearing following the Appeals Council remand, plaintiff testified that he weighed 240-245 pounds. (Tr. at 741.) He said that the heaviest he had ever weighed was 300 pounds, and that he got down to 160 pounds in 1993 or 1994. (Tr. at 742.) The ALJ noted that plaintiff carried his weight pretty well. (Tr. at 741.)

Plaintiff indicated that since the last hearing he performed some part-time work mowing grass. (Tr. at 742-44.) He testified that he made about $600 to $800 for the season, and the most he worked was five hours in a day. (Tr. at 744-45.) He also changed brakes and oil on his own, for about $30. (Tr. at 745.)

Plaintiff testified that he lived with his girlfriend and twelve year old daughter. He said that he did some chores around the house, such as vacuuming, folding clothes and washing

11

dishes. He tried to walk for exercise, four to five blocks, after which he had to sit and rest for about ½ hour. (Tr. at 748-49.) He stated that he elevated his legs four to five times per day. (Tr. at 750.) He rated his pain as 8 on a 0-10 scale, for which he took Lyrica, which provided some relief but with side effects. (Tr. at 750-51.) He indicated that he could lift up to twenty pounds, but not repetitively. He performed yard work but only for forty-five minutes to an hour. (Tr. at 751.) Plaintiff testified that he could not handle full-time work based on his experience with part-time work. He stated that his hands cramped up even when performing less strenuous tasks. (Tr. at 752.)

The ALJ summoned a different VE, Robert Verkins, to the 2008 hearing, and again asked a series of questions assuming a hypothetical person of plaintiff's age, education and work experience. The first assumed a person able to lift twenty pounds occasionally, ten pounds frequently, with a sit/stand option every thirty minutes throughout an eight hour day. (Tr. at 759-60.) Verkins opined that such a person could not perform plaintiff's past work but could perform other jobs such as light industrial assembly, light production inspector, and light hand packager. (Tr. at 760.) At the sedentary level, the VE identified the jobs of bench assembly and production inspector. Verkins also affirmed the appropriateness of the general office clerk, security guard and food preparation positions mentioned by the VE at the previous hearing, although in lower numbers. (Tr. at 760-61.) He classified the food prep job as light, and the general office and security jobs as sedentary. The VE testified that none of his answers would change based on plaintiff's weight. (Tr. at 761.) However, if the person needed an unscheduled break every hour for at least five minutes to walk around, none of the jobs could be done. (Tr. at 762-63.) If the person needed to elevate his legs for 50% of the time in a sedentary job, no positions would be available. (Tr. at 763.) Finally, if the person could

12

perform no fine finger manipulation, the number of jobs would be reduced by 50%. (Tr. at 763.)

## C.    Administrative Decisions

As alluded to earlier, the ALJ in his 2008 decision adopted portions of the 2006 ruling; I therefore discuss both decisions. In the 2006 decision, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date, and that plaintiff suffered from the severe impairments of coronary artery disease and a depressive disorder, neither of which met or equaled a Listing. (Tr. at 67-69.) The ALJ then determined that plaintiff retained the RFC for light work with a sit/stand option that permitted him to change positions every thirty minutes. In so finding, the ALJ rejected the reports from Drs. Lanzarotti and Courier as inconsistent with their treatment notes and based primarily on plaintiff's self-reports. (Tr. at 70.) The ALJ did not separately address Dr. Dresden's report, as he incorrectly attributed it to Dr. Courier. Relying on the VE, the ALJ determined that plaintiff could not return to past work, performed at the medium level or greater, but could perform other jobs such as general office clerk, security guard and food preparer. He therefore found plaintiff not disabled and denied the application. (Tr. at 71-72.)

In his 2008 decision, the ALJ again determined that plaintiff had not worked since the alleged onset date, and that he suffered from severe impairments. In this decision, in addition to coronary artery disease, the ALJ added fibromyalgia and obesity as severe impairments but omitted depression. (Tr. at 20-23.) After finding that none of plaintiff's impairments met or equaled a Listing, the ALJ again determined that plaintiff retained the RFC for light work with a sit/stand option such that he would not have to sit or stand for more than thirty minutes at a time. (Tr. at 23.) The ALJ stated that since the Appeals Council had not questioned aspects of his decision other than omission of an obesity evaluation, it was reasonable to conclude

13

that the previous decision was otherwise sufficient. (Tr. at 24.) He therefore did not revisit the treating source reports.

Regarding plaintiff's obesity, the ALJ noted that plaintiff made no allegation that his weight interfered with his ability to perform routine physical activities. The ALJ noted that plaintiff reported engaging in activities such as replacing brake pads, crawling beneath a car to change oil, and climbing on and off commercial lawn mowing equipment. The ALJ further concluded that no objective medical evidence indicated that plaintiff's obesity had a significant impact on his ability to ambulate or perform routine physical activities in a work setting. (Tr. at 25.)

The ALJ noted that plaintiff saw Dr. Jasek in 2007, since the previous decision, and the doctor diagnosed fibromyalgia. But Dr. Jasek's notes contained no mention of the effects of plaintiff's obesity or its effects on his fibromyalgia. (Tr. at 24.) The ALJ further noted that Dr. Jasek reviewed no lab reports, which could be used to confirm the diagnosis of fibromyalgia. Finally, the record contained no indication that plaintiff followed up with Dr. Jasek, as the doctor recommended. The ALJ noted that the only other new medical evidence pertained to plaintiff's June 2007 cardiac catheterization. The surgery was successful, and plaintiff was discharged the following day with instructions to follow up with his doctor. Based primarily on his appearance at the hearing and his daily activities, the ALJ rejected plaintiff's testimony of greater limitations. (Tr. at 25.)

Based on the RFC, the ALJ again concluded that plaintiff could not perform his past work but could perform other jobs identified by the VE including light industrial assembler, light production inspector, light hand packager, general office clerk, bench work assembler, security guard monitor and food preparer. The ALJ therefore found plaintiff not disabled and denied

14

the application.  (Tr. at 24-27.)

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in (1) evaluating the treating source reports from Drs. Courier, Lanzarotti and Dresden; (2) finding his mental impairment non-severe; (3) assessing the Listings; and (4) determining credibility.  I address each argument in turn.

## A.    Treating Source Reports

### 1.    Legal Standard

Because of their greater familiarity with the claimant's conditions and circumstances, the SSA affords medical opinions from a claimant's treating physicians special consideration.  If such an opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight."  SSR 96-8p; Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000).  Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he may not simply reject it.  SSR 96-2p.  Rather, he must determine the weight to give the opinion by considering various factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist.  20 C.F.R. § 404.1527(d).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p.  Regardless of the weight the ALJ elects to give the treating source opinion, he must always "give good reasons" for his decision.  20 C.F.R. § 404.1527(d)(2).  Finally, the "ALJ must not substitute his own judgment

15

for a physician's opinion without relying on other medical evidence or authority in the record."

Clifford, 227 F.3d at 870; see also Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996).

### 2. Analysis

As indicated, the ALJ in his 2008 decision essentially adopted his conclusions about the medical evidence and treating source reports from the 2006 decision. (See Tr. at 24.) In the earlier decision, the ALJ rejected Dr. Courier's report because she provided no specific clinical testing data to support her diagnoses or limitations (Tr. at 68), and the treatment notes from Dr. Courier and other physicians contained nothing to account for plaintiff's allegations of joint problems and muscle pain (Tr. at 69). The ALJ also paraphrased one of Dr. Courier's treatment notes, in which she stated that she was not sure what to do with plaintiff. (Tr. at 68.) He therefore concluded that Dr. Courier based her physical limitations primarily on plaintiff's subjective complaints. (Tr. at 69.) Regarding Dr. Courier's mental limitations, the ALJ noted that plaintiff had received little mental health treatment, and that Dr. Halvorson indicated that plaintiff's depression was related to his physical health, that any limitations were related to physical complaints, and that his GAF had been 70 within the last year. The ALJ further noted that the SSA consultants and the medical expert found only mild to moderate limitations. (Tr. at 69.) The ALJ rejected Dr. Lanzarotti's report because the doctor believed all of plaintiff's symptoms to be due to incisional pain and released plaintiff to full activity back at work. (Tr. at 68) The ALJ further noted that testing completed by Drs. Ahmed and Lowell revealed little (Tr. at 69-69), with Dr. Lowell stating that she was not sure what she was dealing with, and that plaintiff's complaints might be psychosomatic (Tr. at 68). The ALJ concluded that "the opinions of Drs. Lanzarotti and Courier as to the claimant's limitations are inconsistent with their own medical notes and appear to be based substantially on the claimant's self reports rather than

16

demonstrable signs and symptoms." (Tr. at 70.) As noted above, the ALJ did not separately address Dr. Dresden's report, because he erroneously believed that it had been prepared by Dr. Courier. (Tr. at 68.)

There are several problems with the ALJ's analysis. First, Drs. Courier and Dresden based their physical limitations primarily on a diagnosis of fibromyalgia, but the ALJ refused to find plaintiff's fibromyalgia a severe impairment in the 2006 decision, revealing a serious misunderstanding of the disease. The ALJ wrote that the diagnosis rested almost entirely on plaintiff's "subjective complaints, with no actual evidence on laboratory testing of any significant medical problem." (Tr. at 70.) He later wrote that, "aside from subjective reports of tenderness, there is little evidence upon which to base a diagnosis. The claimant has no swelling, erythema, or heat and totally normal laboratory tests." (Tr. at 70.)

The Seventh Circuit rejected this sort of analysis in <u>Sarchet v. Chater</u>. The court of appeals first explained that fibromyalgia is

> a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

78 F.3d at 306 (internal citations and quote marks omitted); <u>see also</u> Social Security Memorandum on Fibromyalgia (May 11, 1998) (stating that the SSA recognizes fibromyalgia as medically determinable if there are signs that are clinically established by the medical record, with such signs being primarily the tender points), <u>available at</u>

17

http://www.myalgia.com/SSA_FM.htm (last visited November 19, 2009). The ALJ in Sarchet "depreciated the gravity of Sarchet's fibromyalgia because of the lack of any evidence of objectively discernible symptoms, such as a swelling of the joints." 78 F.3d at 307. The court stated that "[s]ince swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced." Id. The same can be said of the ALJ's search for confirmatory swelling and lab reports in this case.

In the 2008 decision, the ALJ found that plaintiff's fibromyalgia was a severe impairment yet made similar errors in talking about the condition. After discussing Dr. Jasek's diagnosis, based on 18 of 18 tender points (Tr. at 24), the ALJ wrote that "laboratory reports which could be used to confirm the diagnosis of fibromyalgia were not reviewed by Dr. Jasek and were not supplied by the claimant's representative for inclusion in the record." (Tr. at 25.) Again, there are no laboratory reports that would confirm fibromyalgia. Therefore, nothing in the 2008 decision – which does not, in any event, specifically address the treating source reports – cures the errors in the 2006 decision. It may be that plaintiff's fibromyalgia cannot support the limitations set forth in the treating source reports (indeed, the condition is usually not disabling, see Sarchet, 78 F.3d at 307), but plaintiff is entitled to a decision based on a proper understanding of this impairment.[1]

---

[1]The Commissioner notes that the ALJ's task was not to determine whether plaintiff has fibromyalgia but rather to determine how disabling the condition is. The Commissioner contends that the ALJ reasonably determined that plaintiff was not totally disabled due to fibromyalgia based on his daily activities and the lack of objective medical support. However, the reviewing court cannot have confidence in an ALJ's evaluation of a condition when the decision reveals a pervasive misunderstanding of that condition. See Carradine, 360 F.3d at 755; Sarchet, 78 F.3d at 307.

18

Second, the ALJ erroneously attributed Dr. Dresden's report to Dr. Courier. The Commissioner concedes the mistake but argues that the error was harmless. The Commissioner notes that the ALJ considered the limitations in the report, even if he misunderstood who wrote it, reasonably concluding that the objective medical evidence did not support the limitations. But Dr. Dresden examined plaintiff prior to completing the report, finding multiple trigger points throughout his back and shoulders. (Tr. at 488.) It is difficult to uphold a decision, based primarily on an alleged conflict between a provider's report and his treatment notes, when the ALJ could not properly match the notes to the provider.[2]

Third, the ALJ relied on a shaky understanding of the record in rejecting Dr. Courier's report. The ALJ seemed to believe that Dr. Courier treated plaintiff only in 2002 and 2003 (Tr. at 68), when in fact she treated him through 2006. Length of treatment relationship is an important factor under 20 C.F.R. § 404.1527(d), and the ALJ's error in this regard leaves me with little confidence that he properly evaluated the report. In rejecting Dr. Courier's mental limitations, the ALJ noted that Dr. Halvorson found a GAF of 70 within the last year. (Tr. at 69.) But Dr. Halvorson found a current GAF of 50, suggestive of a more severe impairment.[3]

Fourth, the ALJ discounted Dr. Lanzarotti's report because the doctor stated, in a June 4, 2003 note, that plaintiff's symptoms were likely due to incisional pain. (Tr. at 280.) However,

_____

[2]The Commissioner contends that the ALJ could have discounted Dr. Dresden's report because he had the least extensive treatment history with plaintiff of all the treating doctors. Not only is this argument impermissibly post-hoc, see Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."), it points up the problems created by the ALJ's erroneous attribution of this report to Dr. Courier. An ALJ cannot properly consider the factors in § 404.1527(d), including the length and nature of the treatment relationship, if he does not know who the doctor is.

[3]I discuss plaintiff's alleged mental impairment in more detail later in this decision.

Dr. Lanzarotti nevertheless ordered a stress test at that time, which revealed "some reversible ischemia involving the low anteroapical wall as well as the inferolateral and inferoseptal wall junction." (Tr. at 277.) On July 2, 2003, Dr. Lanzarotti advocated cardiac cathererization (Tr. at 277), which was performed at St. Luke's Hospital on July 11, 2003 (Tr. at 221; 275). The notes from St. Luke's indicate that, since the previous cardiac procedure, plaintiff "has had total occlusion of the saphenous vein graft to the posterior descending branch which has now collateralized." (Tr. at 222.) The ALJ skipped this evidence, which suggests that plaintiff's symptoms were not related simply to incisional pain.

The ALJ further noted that Dr. Lanzarotti released plaintiff to full activity back at work. (Tr. at 68.) Presumably, the ALJ referred in this regard to a one-sentence hand-written note, in which Dr. Lanzarotti released plaintiff from work for three weeks after the July 11, 2003 procedure. (Tr. at 274.) The note does not address any restrictions, and it is hard to see how it trumps the doctor's later, more detailed report.

The Commissioner notes that the ALJ also cited plaintiff's daily activities, the opinions of the state agency consultants, and the findings of Dr. Ahmed in setting RFC. Even if this evidence could be deemed substantial, the court cannot uphold a decision "when the reasoning process employed by the decision maker exhibits deep logical flaws." Carradine, 360 F.3d at 756. Because the ALJ failed to provide good reasons for rejecting the treating source reports, based on a review of the entire record, the matter must be remanded.

**B.    Mental Impairment**

**1.    Legal Standard**

When a claimant alleges disability due to a mental impairment, the ALJ must apply a

20

"special technique" in evaluating the claim. 20 C.F.R. 404.1520a(a). Under this technique, the ALJ first considers whether, under the "A criteria" of the Listings, which substantiate medically the presence of a particular mental disorder, the claimant has a medically determinable mental impairment. § 404.1520a(b)(1). If so, the ALJ must under the "B criteria" rate the degree of functional limitation resulting from the impairment. § 404.1520a(b)(2).[4] The B criteria have four components: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). On the other hand, if the ALJ rates the degree of limitation as "none" or "mild," he may generally find that the claimant has no severe mental impairment. § 404.1520a(d)(1). If the claimant has a severe mental impairment that does not meet or equal a Listing, the ALJ must determine the claimant's mental RFC, which requires consideration of an expanded list of work-related capacities, including the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting. Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003); 20 C.F.R. § 404.1545(c).

2.    Analysis

In the 2006 decision, the ALJ included depressive disorder in the heading list of severe

_____

[4]Certain Listings also contain additional functional criteria called paragraph C criteria.

21

impairments (Tr. at 67) but later stated, after reviewing the reports from the state agency consultants and the testimony of the medical expert, that plaintiff had "no severe mental impairment" (Tr. at 69). In the 2008 decision, the ALJ omitted depression from the list of severe impairments (Tr. 20), noted his assessment of the B criteria in the 2006 ruling (mild limitation of daily activities and social functioning; mild to moderate limitation of concentration, persistence and pace; and no episodes of decompensation), and indicated that no new evidence altered that conclusion. He accordingly found that plaintiff's mental impairment was non-severe. The ALJ acknowledged that the B criteria do not constitute an RFC determination, and that the mental RFC assessment relevant to steps four and five required a more detailed itemization of various functions. The ALJ indicated that he had translated the B criteria into work-related functions in the RFC assessment set forth later in the decision. (Tr. at 22.) However, the ALJ did not, in setting RFC, include any mental limitations. (Tr. at 23.)

The decision again leaves me with serious doubt that the ALJ fully understood the record. Aside from the contradictions set forth above, I note that the state agency consultant, Dr. Bauer, found that plaintiff had a severe mental impairment (Tr. at 468), which caused moderate difficulty in maintaining concentration, persistence and pace (Tr. at 478). The medical expert, Dr. Sherry, likewise found mild to moderate limitations in this area. (Tr. at 727.) Moderate limitations under the B criteria are suggestive of a severe impairment, see, e.g., Elkins v. Astrue, No. 4:08-cv-77, 2009 WL 1124963, at *9-11 (S.D. Ind. Apr. 24, 2009), and the ALJ should account for such limitations in setting mental RFC, see, e.g., Rasnake v. Astrue, No. 1:08-CV-134, 2009 WL 1085969, at *14 (N.D. Ind. Apr. 22, 2009). Indeed, Dr. Bauer, in his mental RFC assessment, found moderate limitations in several areas. (Tr. at 464-65.) Further, the state agency examiner, Dr. Halvorson, while attributing plaintiff's mental problems

22

primarily to his physical health, nevertheless diagnosed major depression, severe, with a current GAF of 50. A GAF rating between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning, while a rating between 51 and 60 indicates moderate symptoms or impairments in these areas. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). Finally, Drs. Courier and Dresden found severe depression, which limited plaintiff's ability to work. (Tr. at 123; 483.) As discussed above, the ALJ failed to properly evaluate these reports.

The Commissioner argues that the ALJ's failure to find a severe mental impairment at step two is irrelevant because he found other severe impairments and continued with the five-step analysis. However, any step two error can be deemed harmless only if the ALJ accounted for mental limitations in setting RFC. See Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005). In this case, as noted above (and despite acknowledging that his assessment of the B criteria did not constitute an RFC determination), the ALJ factored no mental limitations into the RFC. The Commissioner contends that the ALJ properly considered the medical evidence and reasonably found no significant vocational limitations based on plaintiff's alleged mental impairment. But as indicated above, the expert opinions from both the consultants and the treating sources were unanimous in finding a severe mental impairment, which caused at least some limitation in plaintiff's ability to work. The nature and extent of those limitations will be a matter for the ALJ to determine on remand, but substantial evidence does not support an RFC including no mental limitations.[5] Therefore, the ALJ will on

_____

[5]The Commissioner notes that Dr. Halvorson found that plaintiff could handle simple instructions, interact appropriately with others, and handle routine stress and changes in the work place. However, the ALJ did not limit plaintiff to routine, simple, low stress or any such category of work, which might comport with Dr. Halvorson's findings. Further, plaintiff's

23

remand have to take another look at plaintiff's alleged mental impairment and factor any mental limitations into the RFC.

## C.    The Listings

### 1.    Legal Standard

A social security claimant is deemed presumptively disabled if he has an impairment that meets or equals an impairment found in the Listing of impairments.  Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004).  In order to meet a Listing, the claimant must present evidence showing that he satisfies each of its criteria.  See Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999).  A claimant may also demonstrate presumptive disability by showing that his impairment is accompanied by symptoms that are equal in severity to those described in a specific Listing.  Barnett, 381 F.3d at 668.  In considering whether a claimant's condition meets or equals a Listed impairment, the ALJ should mention the specific Listing he is considering and offer more than a perfunctory analysis.  Id.  Failure to do so may require remand.  Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006).

### 2.    Analysis

The ALJ determined that plaintiff had severe impairments, but that none met or medically equaled any Listing.  The ALJ noted that plaintiff did not allege a Listing level impairment, nor had he presented medical evidence supporting such a finding.  (Tr. at 23.)

Plaintiff argues that while the ALJ cited boilerplate standards for the assessment of obesity, he offered only a cursory analysis.  He further notes the findings of cervical spine abnormalities, and that the ALJ failed to discuss the spine Listings.  However, plaintiff did not

_____

physicians suggested greater limitations, and the ALJ must re-evaluate their reports on remand.

24

contend at the administrative level that he met or equaled any particular Listing (Tr. at 648), despite being represented by counsel, see Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits."). Nor does he make any serious effort to demonstrate equivalence now. Therefore, even if the ALJ did err in discussing the Listings, the error is harmless. Further, the ALJ spent considerable time discussing plaintiff's obesity and its potential effect on his ability to work (Tr. at 21-22, 24-25), and I cannot deem his analysis on this issue perfunctory.[6]

**D.    Credibility**

   **1.    Legal Standard**

In evaluating the credibility of a claimant's allegations of pain or other disabling symptoms, the ALJ must follow a two-step process. See SSR 96-7p. First, the ALJ must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect his ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit his ability to work. SSR 96-7p. In making this determination, the ALJ may not discredit a claimant's testimony about his pain or other limitations based solely on a lack of support in the medical evidence. Villano, 556 F.3d at 562; Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009).

———————————

[6]In his reply brief, plaintiff notes that the ALJ did not consider medical equivalence regarding fibromyalgia. Again, though, he makes no effort to show that his impairments meet any Listing. The ALJ will, on remand, have to consider the combined effects of all of plaintiff's impairments in setting RFC, but I cannot find any step three error.

25

Rather, the ALJ must consider all of the evidence, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must, under SSR 96-7p, provide specific reasons for a credibility determination, grounded in the evidence and articulated in the decision. See Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). Such reasons may not be implied or supplied later by the Commissioner's lawyers. Golembiewski, 322 F.3d at 916.

The court generally reviews an ALJ's credibility determination deferentially, reversing only if it is patently wrong. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008) (citing Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006)). However, the court may reverse when the ALJ fails to comply with SSR 96-7p, including the Ruling's explanation requirement. See, e.g., Brindisi v. Barnhart, 315 F.3d 783, 787-88 (7th Cir. 2003).

**2.    Analysis**

In the 2008 decision, the ALJ found that plaintiff's impairments could produce the alleged symptoms, but that plaintiff's statements about the intensity, persistence and limiting effects of the symptoms were not supported by the evidence. In support of that finding, the ALJ noted that plaintiff appeared strong and muscular, and did not display pain behaviors or discomfort at the hearing; that plaintiff's daily activities were not as limited one would expect given the complaints of pain; and that plaintiff did not follow-up on recommendations made by

26

Dr. Jasek, which suggested that plaintiff's fibromyalgia was not as severe as alleged. The ALJ concluded: "Although the inconsistencies outlined here may not be the result of a conscious intention to mislead on the claimant's part, these inconsistencies draw in to question the accuracy of the claimant's statements." (Tr. at 25.)

Plaintiff first faults the ALJ for relying on his own observations of plaintiff's appearance and manner at the hearing. It is true that courts, including the Seventh Circuit, have expressed discomfort with the use of so-called "sit and squirm" tests. See, e.g., Powers, 207 F.3d at 436. Nevertheless, the court of appeals has "repeatedly endorsed the role of observation in determining credibility and refuse[d] to make an exception in this situation." Id. The Powers court held that:

> The hearing officer had an opportunity to observe Powers for an extended period of time and could gauge whether her demeanor, behavior, attitude and other characteristics suggested frankness and honesty and were consistent with the general bearing of someone who is experiencing severe pain. Also, because the witness showed no signs of pain, there is no danger that she attempted to manipulate the hearing officer by squirming. As one of several factors that contributed to the hearing officer's credibility determination, we cannot say this rendered that judgment "patently wrong."

Id. I also see nothing inherently suspect with the ALJ's observation about how plaintiff "carried" his weight. As the ALJ said at the hearing, "Some people carry their weight differently than others." (Tr. at 741.) It is true that, according to his Body Mass Index ("BMI"), plaintiff is obese. However, "while '[v]irtually all social science research related to obesity uses body mass index (BMI), . . . there is wide agreement in the medical literature that such measures are seriously flawed because they do not distinguish fat from fat-free mass such as muscle and bone.'" Erin E. Patrick, Lose Weight or Lose Out: The Legality of State Medicaid Programs That Make Overweight Beneficiaries' Receipt of Funds Contingent Upon Healthy Lifestyle Choices, 58

27

Emory L.J. 249, 282 (2008) (quoting John Cawley & Richard V. Burkhauser, <u>Beyond BMI: The Value of More Accurate Measures of Fatness and Obesity in Social Science Research</u> 1 (Nat'l Bureau of Econ. Res., Working Paper No. 12291, 2006)).

Plaintiff gains more traction with his challenge to the ALJ's reliance on daily activities. The Seventh Circuit has long cautioned against placing undue weight on a claimant's household activities in assessing his ability to work outside the home. <u>See, e.g.</u>, <u>Moss</u>, 555 F.3d at 562. The court of appeals has further held that it is not enough to simply describe a claimant's activities without explaining how they are inconsistent with the pain and limitations he claims. <u>See</u> <u>Villano</u>, 556 F.3d at 562. Nor may the ALJ disregard a claimant's limitations in performing household activities. <u>Moss</u>, 556 F.3d at 562. In this case, the ALJ provided a list of household chores (e.g., vacuuming, dishes, laundry) and other odd jobs (e.g., mowing grass, changing oil) plaintiff performed, but he failed to explain how they undercut plaintiff's claims or to consider plaintiff's testimony as to his limitations in performing such tasks. For example, plaintiff testified that he limited the number of hours he mowed lawns (Tr. at 745), that he had to sit down and rest after vacuuming for ½ hour (Tr. at 709), and that it took him a long time to perform simple automotive jobs because of his physical limitations (Tr. at 751). This is not to say that plaintiff's ability to perform such tasks, even for a limited time, should be ignored. <u>See</u> <u>Berger v. Astrue</u>, 516 F.3d 539, 546 (7th Cir. 2008) (noting that while the claimant's ability to work only part-time indicated that he was not at his best, the fact that he could perform some work cut against his claim that he was totally disabled). However, plaintiff is entitled to a determination based on the entire record, not just the evidence against his claim. <u>See</u> <u>Herron</u>, 19 F.3d at 333 (stating that an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion").

It is also difficult to credit the ALJ's reliance on plaintiff's alleged lack of follow-up with Dr. Jasek. Aside from noting that Dr. Jasek requested plaintiff return in three months (Tr. at 25), the ALJ does not otherwise explain the alleged non-compliance. Nor does he consider any reasons why plaintiff may not have gone back to Dr. Jasek, as the credibility Ruling requires. SSR 96-7p ("The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

Finally, the ALJ's misunderstanding of fibromyalgia leaves serious doubts about the validity of his pain analysis. See Sarchet, 78 F.3d at 308-09. Therefore, the matter must be remanded for re-evaluation of this issue as well.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly. Because the ALJ has now twice failed to produce an acceptable decision, I recommend that the Commissioner on remand assign the case to a different ALJ. See Sarchet, 78 F.3d at 309.

Dated at Milwaukee, Wisconsin this 27th day of November, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

29